IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | |
|---|---|
| PANIRCELVAN S/O   KALIANNAN, TONG LAY YEEN GIOVANNA, JARYL TAN HOCK SENG AND ROGER TEO KOK WEI, KHIM HO TEO AND CHRISTINA CHANG AND ERIN KOH AND ANGIE NG, AND THONG JUAY KOH AND SIEW GEOK TONG, | CASE NO. _____ |
| Plaintiffs, | |
| vs. | COMPLAINT AND JURY DEMAND |
| WINSTORN EE HOONG LIANG, | |
| Defendant. | |

**COME NOW** Plaintiffs, by and through their undersigned counsel, and in support of their Complaint and Jury Demand state to the Court the following:

### I. SUMMARY

1.      Defendant offered and sold to Plaintiffs, and actively assisted North Dakota Developments, LLC ("NDD") in offering and selling, unregistered, nonexempt and fraudulent securities from approximately May 2012 to April 2015. Specifically, Defendant acted as NDD's agent in connection with offering and selling interests in certain modular housing units coupled with management agreements—"investment contracts" under North Dakota and federal law—to hundreds of domestic and foreign investors including Plaintiffs.

2.      The investments Defendant sold on NDD's behalf were securities in the form of Land Lease and Management Agreements and membership units in four commercial housing developments for workers in the Bakken oil field region of western North Dakota and eastern Montana—so-called "man camps" intended to house oil and gas workers.    The four

developments were known as Great American Lodge – Watford City West, Great American Lodge – Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East.

3.    These NDD investment contracts and membership units offered and sold by Defendant to Plaintiffs are securities under North Dakota and federal law.  *See* N.D.C.C. § 10-04-02(19); *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946); Section 2(a)(1) of Securities Act (15 U.S.C. 77b(a)(l)) and Section 3(a)(10) of the Securities Exchange Act (15 U.S.C. 77b(a)(1)) (defining "security" as including "any . . . participation in any profit-sharing agreement [or] . . . investment contract").

4.    The offerings and sales of these investment contracts and membership units represented an integrated offering of securities (as further discussed below), generally referred to below as the "NDD Offering."

5.    NDD made the NDD Offering through general advertising, including an internet website, print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls, videos, and flyers. NDD also utilized sales agents including Defendant, who were paid commissions of at least 10 percent and sometimes as much as 20 percent of the amounts invested by the investors they recruited.

6.    NDD ultimately raised approximately $62 million in connection with the fraudulent NDD Offering.

7.    None of the securities sold in connection with the NDD Offering were registered with the Securities and Exchange Commission or any state securities regulator including the North Dakota Securities Department, nor were they exempt from registration.

8.    None of the securities sold in connection with the NDD Offering were sold by or through a broker-dealer or agent registered under N.D.C.C. § 10-04-10.  Defendant was never  a

broker-dealer or registered agent of a broker-dealer.

9.     Therefore, sales made by NDD's sales agents including Defendant were in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10, and render such agents strictly liable – and jointly and severally liable together with NDD – to the NDD investors, including Plaintiffs.

10.    The offering materials of the NDD Offering contained material misrepresentations and failed to disclose material facts necessary to make the statements made in the offering documents, in light of the circumstances under which they were made, not misleading, in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10. Among others, they failed to disclose that the NDD securities were indeed securities, and instead portrayed such securities as investments in real estate; they failed to disclose to investors that the NDD Offering was unregistered and nonexempt, thus in violation of the federal and North Dakota's securities laws and regulations; they failed to disclose that NDD was paying huge sales commissions to the selling agents, and that such agents were unlicensed; they also failed to disclose that NDD and its principals were misusing and misappropriating investor money and NDD was a fraud.

11.    Defendant offered and sold the North Dakota-issued, unregistered and fraudulent NDD securities, and actively assisted the North Dakota-based NDD and its principals' perpetration of the unlawful NDD Offering of securities to Plaintiffs and others.  Among other acts, Defendant communicated numerous times with North Dakota-located agents of NDD; traveled to North Dakota to meet with NDD in connection with his promotion of NDD securities to investors; obtained and sent promotional documents to NDD and its agents in North Dakota; approached prospective NDD investors and urged them to purchase the North Dakota-issued NDD securities; directed NDD investors to send their investment-related paperwork as well as

their investment proceeds to North Dakota agents of NDD; and received outrageously high sales commissions from investor funds wired to North Dakota.

12.    As NDD's unlawful sale of unregistered securities and other unlawful conduct began coming to light, the Securities Exchange Commission brought suit against NDD, its principals Robert Gavin and Daniel Hogan, and various other relief defendants, alleging violation of the federal securities laws.  *See* SEC v. North Dakota Developments, LLC et al., U.S. District Court, District of North Dakota, Case. No. 15-00053.

13.    At the SEC's request, attorney Gary Hansen was appointed Receiver for NDD. According to the Receiver's initial report dated June 26, 2015, despite diligent efforts he had only located approximately $175,000 in cash and liquid assets owned by NDD.

14.    Plaintiffs now bring this action against Defendant for statutory damages arising from Defendant's actions as NDD's sales agent and his conduct in actively assisting NDD in connection with the unlawful NDD Offering.  *See* N.D.C.C. § 10-04-17 (providing that every "agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser.").

15.    Plaintiffs' claims against Defendant are for strict liability arising out of Defendant's sales of NDD's unregistered and fraudulent securities, and Defendant's sales of securities as an unregistered agent, in violation of the North Dakota securities laws. No allegations of fraud or knowing or intentional misconduct are being made against Defendant.


## II.  JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§1331 and 1367(a), as this case arises under the laws of the United States.

17.   This Court has personal jurisdiction over Defendant because, among other things, Defendant: actively recruited investors to invest in a North Dakota company; brokered the sale of interests in North Dakota real property and of North Dakota-issued securities; received fraudulent offering documents from North Dakota and directed communications to North Dakota, pertaining to their fraudulent sales of NDD securities; received commissions from North Dakota in connection with their sales; directed investor funds and investment-related paperwork to be sent to a North Dakota law firm in connection with the sales; communicated extensively with various North Dakota entities in connection with the sales; travelled to North Dakota specifically for the purpose of marketing and selling the investments to Plaintiffs and other investors, and on such trips taking video and still photographs as "evidence" of and for the purpose of, due diligence that the NDD buildings were functioning and the oil business as thriving as advertised (see Figs. 1&2 below); and, acted as a necessary intermediary in connection with a fraud emanating from North Dakota.

18.   Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this District.

### III. PARTIES

19.   Plaintiffs are individuals and entities who purchased the unregistered NDD investments from Defendant and were damaged as a result.  Plaintiffs' names, claimed damages, and investment dates are as follows:

a.   Panircelvan S/O Kaliannan, a Singaporean national, invested a total of $54,715.00 in NDD in July 2013, all through Defendant, and received returns of $1,597.84.

b.    Khim Ho Teo, Erin Koh, Angie Ng, and Christina Chang, all Singaporean nationals, invested a total of $231,750.00 in NDD in July 2013, all through Defendant, and received returns of $35,715.00

c.    Jaryl Tan Hock Seng and Roger Teo Kok Wei, both Singaporean nationals, invested a total of $46,796.00 in NDD in July 2013, all through Defendant, and received returns of $7,935.95.

d.    Tong Lay Yeen Giovanna, a Singaporean national, invested a total of $50,932.90 in NDD in July 2013, all through Defendant, and received returns of $9,995.59.

e.    Thong Juay Koh and Siew Geok Tong, both Singaporean nationals, invested a total of $628,117.00 in NDD in June and July 2013, all through Defendant, and received returns of $104,427.71.

20.    Defendant Winstorn Ee Hoong Liang ("Winstorn") is an individual who at all times material hereto resided in Singapore.  Defendant conducted extensive business and engaged in numerous communications with North Dakota entities, and traveled to North Dakota, in connection with and for the purpose of his sales and marketing of NDD securities to Plaintiffs and others. Winstorn is the man in Figures 1 and 2, below.

21.    Defendant Winstorn is not and upon information and belief has never been a licensed securities agent.

22.    Defendant Winstorn recruited investors to invest in North Dakota-issued NDD securities and directed such investors to invest in North Dakota by purchasing the NDD securities. Winstorn continuously and systematically throughout the life of the NDD scheme conducted extensive business in North Dakota; traveled to North Dakota; and directed numerous

5

communications to and received numerous communications from entities in North Dakota, all for the purpose of offering and selling the North Dakota-issued NDD securities.

23.    Defendant Winstorn directed to and received from Plaintiffs and other NDD investors numerous communications regarding NDD and the NDD securities. Defendant offered NDD securities to Plaintiffs, sold them NDD securities, and discussed with Plaintiffs the status of their NDD investments after making such sales.

## IV.  FACTS

### A.    NDD Perpetrates a Fraudulent Real Estate Investment Scheme, with Defendant's Help and Assistance.

24.    Defendant, as agent of NDD, offered and sold, and materially assisted NDD in selling, investments in four ostensibly separate projects:  Great American Lodged – Watford City West, Great American Lodge – Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East. NDD offered the investments to investors in the United States, the United Kingdom, France, Spain, Australia, Singapore, and various other countries.

25.    Investments in NDD's four projects were structured similarly.  In each instance, investors purchased a "unit" or "units" in one or more of NDD's projects for approximately $50,000.00 to $90,000.00 per unit.  Each unit represented a fractional interest in a modular housing unit at one of the four sites, and was coupled with a management agreement pursuant to which NDD was to manage the units as an integrated "man camp."

26.    NDD's collective management of the units as an integrated "man camp" was an essential element of the investment. NDD "recommended" that investors select it to manage their units pursuant to the management agreement, and required investors who chose another person

or entity to manage their units pay an exorbitant annual lease fee of $24,000.00 per unit. NDD intended the $24,000.00 lease fee to be so uneconomical as to dissuade investors from choosing that option, and it appears every NDD investor agreed to have NDD manage the units purchased.

27.    All Plaintiffs agreed to have NDD manage the units they were to purchase, and entered into a management agreement with NDD.

28.    Pursuant to the management agreement, NDD agreed to pay either a fixed return to investors of up to 25 percent per year (which NDD variously referred to as "guaranteed" and "assured") or a variable rate of return based on half of the gross rents it collected.

29.    Approximately 900 to 1,000 investors ultimately purchased units in one of the four NDD developments.

30.    Investors bought "units" in NDD's projects motivated by the potential returns that NDD would provide by allowing NDD to jointly manage all of the units in a fully-developed "man camp," complete with amenities typically found in a hotel or motel.

31.    While NDD marketed its investments as purchases of "units" in real estate developments, the investments were in reality securities under federal and North Dakota's securities law.

32.    Although NDD investor "units" represented a fractional interest in a modular housing unit at one of the four sites, investors were never provided with a title or deed to the property or any other documentation evidencing their ownership.

33.    Despite the lucrative returns NDD promised – and unbeknownst to investors, including Plaintiffs – none of the NDD projects ever made a profit. Indeed, of the four sites, only Great American Lodge – Watford City West ever became operational. That location has a completed amenities building, with services such as food services and laundry, and more than

430 individual housing units that were available to be rented. There were also approximately 70 units that were not completed.

34.    Great American Lodge – Watford City West ceased operations when electric service to the site was shut off on in May 2015 due to non-payment. In addition, due to a problem with the water service at the site, water was being trucked in every few days at considerable cost. The receiver has concluded that it is not economically feasible to reopen Great American Lodge – Watford City West.

35.    Great American Lodge – Culbertson never became operational. There are approximately 132 individual housing units on the site, but no amenities building. NDD attempted to obtain a certificate of occupancy for 44 of the units in spring 2015 but failed the required inspection.

36.    The Transhudson – Parshall site was abandoned at the ground-leveling phase.

37.    The Great American Lodge – Watford City East site never received governmental approval and construction never began.

38.    Unbeknownst to its investors, including Plaintiffs, the NDD real estate investment program was fraudulent. It failed to disclose, among others, that:

    a.    NDD was offering unregistered and nonexempt securities, in violation of the state and federal securities rules and regulations;

    b.    NDD was selling securities through unlicensed agents – such as Defendant – in violation of the securities rules and regulations

    c.    the NDD projects were not profitable;

    d.    the NDD projects were never built, except for the Watford City West project, which was of such poor quality that it could not

generate a profit;

e.     the NDD perpetrators were paying exorbitant commissions to

salespersons such as Defendant, with the investors' money;

f.     the NDD perpetrators were siphoning enormous amounts of money

from NDD and using it for personal purposes;

g.     NDD was a fraudulent, Ponzi-type scheme.

**B.     NDD, with Defendant' Assistance, Perpetrated an Unregistered and Nonexempt Securities Offering to the Investing Public, Including Plaintiffs.**

39.     Unbeknownst to Plaintiffs, the real estate investment "opportunities" offered by NDD were securities, and NDD – through sales agents such as Defendant – was orchestrating an unregistered and nonexempt securities offering, in violation of the state and federal securities laws and regulations.

40.     Specifically, the NDD projects offered to investors by Defendant and other sales agents were "investment contracts" and therefore securities under the Securities Act and the Exchange Act. The definition of a "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)] includes "any. . . participation in any profit-sharing agreement [or] . . . investment contract."

41.     The United States Supreme Court – in addition to numerous lower courts across the country – has repeatedly opined on the subject of sale-and-leaseback programs similar to the NDD Scheme, and has found such sale-and-leaseback arrangements are "investment contracts" within the meaning of federal securities laws.  *See, e.g., SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (citrus groves sold to investors, coupled with management agreements where the sellers purported to manage the groves and pay passive returns to investors create "investment contract" securities) and *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones sold to investors, coupled with

9

management agreements where the sellers purported to manage the payphones and pay passive returns to investors create "investment contract" securities).

42.    The NDD Scheme investments were investment contracts because investors made an investment of money in a common enterprise with an expectation of profits to be derived solely from the efforts of the NDD Scheme.

43.    The NDD Scheme – through Defendant acting as its sales agent – marketed the projects to Plaintiffs as "investments" and referred to the prospective purchasers as "investors."

44.    Plaintiffs and other investors sent money to NDD with the expectation of sharing in profits from NDD's real estate development activities.

45.    Consistent with the management agreements, investors expected that NDD would pool investor funds to develop each project, manage investor units collectively once the project was operational, and distribute profits based on the project's overall success.

46.    NDD also promised investors returns "regardless of the actual rental income received, whether higher or lower than the actual income derived from the unit.

47.    NDD structured the investment contract to ensure that none of the investors chose to manage their own unit.

48.    NDD "strongly" recommended that investors select it to manage the unit.  It also required investors to pay a punitive "lease" payment for renting the ground under their unit, a payment that NDD waived if an investor agreed to have it manage the unit.

49.    Furthermore, NDD's promise of "guaranteed" returns was only available if NDD managed the unit.

50.    Unsurprisingly, each of the investors – including Plaintiffs – selected NDD to manage their unit.

51.     Investors – including Plaintiffs – expected the profits to come solely from NDD's real estate development and management activities. The investors were not required or expected to do anything besides provide funds in order to receive their returns.  NDD described investors' roles as "passive" in marketing materials.

52.     NDD's offerings of real estate "opportunities" were therefore securities.

53.     None of the NDD securities Defendant offered and sold to Plaintiffs were registered with the Securities and Exchange Commission or any state securities regulator including the North Dakota Securities Department.  Likewise, none of the sales were made by or through a broker-dealer or agent registered under N.D.C.C. § 10-04-10.

54.     None of the NDD securities Defendant sold to Plaintiffs were exempt from registration, under the federal or North Dakota securities laws and regulations.

55.     Thus, NDD – with crucial assistance from Defendant, who acted as salesperson for those securities – perpetrated an unregistered, nonexempt securities offering, in violation of the state and federal securities laws.

56.     NDD, through Defendant and with his crucial assistance and participation, made these offerings through general advertising, including an Internet website, commissioned sales agents – including Defendant – print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls, videos, and flyers. These sales efforts constituted a general solicitation for the purchase of securities under North Dakota and federal law.

**C.     The NDD Offering Constituted an Integrated Offering of Unregistered Securities.**

57.     NDD's offerings constituted a single, integrated securities offering.

58.     NDD, through its agents such as Defendant, marketed and sold the investments during overlapping time frames over a considerable period of time, and via similar and

interrelated methods.

59.     All NDD projects were managed, overseen, and promoted by the same individuals.

60.     All NDD projects raised money for the same purported purpose, and the description of such purpose is nearly identical in all the NDD projects' offering documents: to develop and manage short-term housing for those employed in the oil industry in the Bakken oil field region of North Dakota and Montana.

61.     The investments were all of the same type and class, as all involved investment contracts featuring fractional ownership in modular housing units in the same geographic area coupled with management agreements pursuant to which NDD would manage the units.

62.     As more fully described above, money invested in the NDD projects was commingled, misappropriated, used for the benefit of Hogan and Gavin, and used to make Ponzi-like payments to early investors.

63.     The investments were part of a single plan of financing, were integrated, and resulted in the commingling of funds that NDD and its principals diverted for unauthorized purposes.

64.     Accordingly, the securities NDD offered and sold with Defendant's active assistance were part of a single plan of financing, were integrated, and comprised a single, unitary, and fraudulent securities offering that victimized Plaintiffs and all other NDD Scheme investors.

65.     Thus, Plaintiffs are equally situated in that they all invested in the NDD Ponzi Scheme rather than in specific real estate units.

**D.     NDD and Its Principals Divert Investor Funds and Defraud the NDD Investors.**

66.    Unbeknownst to Plaintiffs, NDD and its principals Robert Gavin and Daniel Hogan diverted various funds raised in connection with the NDD Offering for unauthorized purposes.

67.    NDD raised approximately $62 million in connection with the NDD Offering. Notwithstanding the lack of progress on NDD's projects, less than $100,000.00 remained in NDD's main operating account as of February 2015.

68.    After investor funds were disbursed into NDD's operating account, Gavin, and Hogan treated the funds like their personal slush fund.

69.    Rather than use investor funds on the NDD projects, Gavin and Hogan used the funds for other unrelated projects for their own benefit.

70.    For example, Gavin and Hogan used $1.9 million of investor funds from NDD's main operating account to finance an oil and gas project in the name of Augusta Exploration, LLC.

71.    Beginning in February 2013, Gavin and Hogan used at least $5.5 million of investor funds from NDD's main operating account to engage in several real estate transactions unrelated to any investor project, including:

        a.    $1.65 million for the purchase of approximately 19 acres of land near Williston, North Dakota in the name of NDD Holdings 1 LLC;

        b.    $1.395 million for the purchase of approximately 2.3 acres of land in Williston, North Dakota in the name of NDD Holdings 1 LLC;

        c.    $1.19 million in connection with a lease-to-own real estate transaction in Trenton, North Dakota;

        d.    $686,000 for the purchase of land for a single-family residential

development called Horizon Ridge in the name of NDD Holdings 2 LLC; and

 e. $500,000 for the purchase of real estate and inventory in Central City, Nebraska in the name of NDD Modular, LLC.

72. Gavin and Hogan also misappropriated more than $1.3 million for their direct personal benefit. Hogan transferred more than $1 million from NDD's operating account to his personal account in the United States and transferred $350,000 from NDD's operating account to a bank account in Malaysia for Gavin's benefit.

73. In addition, Gavin and Hogan spent at least $2.2 million of investor funds on items characterized by NDD as administrative overhead, including over $1.97 million transferred from NDD's operating account into bank accounts in the United Kingdom in the name of NDD UK. These funds were used to, among other things, provide additional compensation to Gavin and Hogan and pay commissions.

74. NDD did not disclose to investors that their funds would be diverted to fund other projects beneficially owned by Gavin and Hogan. This information would have been material to investors.

75. NDD used agents including Defendant to procure investor funds for their scheme. NDD paid these agents a minimum of 10 percent and, depending on the amount of funds raised by the agent, up to 20 percent of amounts raised as commissions.

76. NDD ultimately paid more than $10.3 million to agents—approximately 16.5 percent of the total funds raised. NDD did not disclose to investors in the offering materials or otherwise that it paid such commissions, nor did it instruct the agents to disclose the existence of such commissions to the investors.

77. NDD also used the proceeds of the sale of interests in Great American Lodge –

Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East to pay purported "returns" to investors in Great American Lodge – Watford City West. Upon information and belief, NDD paid more than $2.4 million from later-stage investors to pay returns to earlier investors. Of course, this diversion of funds was not disclosed to investors.

**E.    Defendant Offers and Sells Unregistered NDD Securities to Plaintiffs Without a Securities License, and Materially Assists and Participates in the Unlawful NDD Offering.**

78.    Defendant played a crucial role in the fraudulent NDD securities offering to Plaintiffs and other investors, as salesperson and aider of the NDD Scheme.

79.    Specifically, Defendant offered and sold the unregistered and nonexempt NDD securities to Plaintiffs, and actively and substantially assisted NDD in offering and selling unregistered and nonexempt securities to the public including Plaintiffs.

80.    Defendant never had a securities license and was never affiliated with a securities-licensed broker-dealer firm, during the time he offered and sold the NDD securities to Plaintiffs.

81.    Defendant worked closely with the NDD Scheme perpetrators, in North Dakota and elsewhere, to prepare marketing materials targeting Plaintiffs and offering the unregistered NDD securities.

82.    Defendant negotiated with the NDD Scheme perpetrators and accepted a compensation based on sales commissions for his sales of unregistered NDD securities to Plaintiffs.

83.    Defendant's compensation was exorbitant: upon information and belief Defendant received as much as 20% of Plaintiffs' investments, in sales commissions.

84.    Such sales commissions were never disclosed to Plaintiffs.

85.    The sales commissions would have been material to Plaintiffs' investment

decision because they substantially diminished the amounts available to be invested and to generate the promised investment returns to Plaintiffs.

86.     Defendant approached each and every Plaintiff and offered to them the NDD "investment opportunity."

87.     Defendant gave each and every Plaintiff investment-related brochures and pamphlets that described the NDD investment opportunity, and described the NDD investment opportunities based on the information in those pamphlets and brochures.

88.     Defendant travelled to North Dakota and took photographs and videos, which he then transmitted to Plaintiffs and other potential investors. These photographs and videos were meant to persuade investors that the NDD properties were operational and that the oil industry activity in the vicinity of Williston was of sufficient volume to make the NDD properties profitable. See Figures 1 and 2, which depict Defendant near buildings identified as NDD development, and in front of an oil operation, respectively.



Fig. 1



Fig. 2

89.    The information conveyed to Plaintiffs by Defendant, regarding the NDD investments, was as glowing as it was false. Defendant omitted to disclose to Plaintiffs any of the crucial issues surrounding the investments described above.

90.    Defendant also failed to disclose to Plaintiffs that:

a.    The NDD investments were securities, and such securities were unregistered and nonexempt;

b.    Defendant was not licensed to sell securities.

c.    Defendant had not conducted any adequate – if at all – investigation and evaluation of the NDD investments prior to presenting them to Plaintiffs;

d.    Defendant had no basis for his representations to Plaintiffs regarding NDD and the NDD investment "opportunity";

e.    Defendant had no basis to recommend the NDD securities to

Plaintiffs;

    f.    Defendant was getting paid exorbitant sales commissions for their

sales.

91.    All such omissions were material to Plaintiffs' investment decision.

92.    Defendant urged Plaintiffs to invest in NDD, based on his false and material misrepresentations and omissions.

93.    Defendant instructed Plaintiffs that, in order to invest, Plaintiffs must transfer their investment proceeds to North Dakota; send their investment-related paperwork to North Dakota; and communicate with the escrow agent in North Dakota regarding their investments.

94.    Plaintiffs, in reliance upon Defendant's fraudulent misrepresentations and omissions, invested in the unregistered and fraudulent NDD securities.

95.    Defendant assisted Plaintiffs with the investment-related paperwork and directed such paperwork to be sent to North Dakota.

96.    Defendant also assisted Plaintiffs in transferring their funds to North Dakota and communicated with North Dakota-based NDD agents to facilitate Plaintiffs' investments.

97.    Defendant received substantial sales commissions, believed to be in the hundreds of thousands of dollars, from North Dakota-based NDD, for his fraudulent and unlicensed sales of unregistered securities to Plaintiffs.

**F.    The NDD Scheme Is Exposed by the SEC, Collapses, Plaintiffs Lose Their Investments.**

98.    As NDD's unlawful sale of unregistered securities through Defendant and other agents, and their other unlawful conduct, began coming to light, the Securities Exchange Commission brought suit against NDD, its principals Robert Gavin and Daniel Hogan, and various other relief defendants, alleging violation of the federal securities laws. *See* SEC v.

18

North Dakota Developments, LLC et al., U.S. District Court, District of North Dakota, Case. No. 15-00053, filed on May 6, 2015.

99.     According to the SEC's complaint, NDD and its principals directly or indirectly made material misrepresentations and omissions regarding the use of investor funds, the payment of commissions, and the anticipated return on the investment.

100.     The SEC alleged, among other things, that NDD made Ponzi-style payments to early investors by paying their "guaranteed" returns using funds raised from later investors.  The SEC also alleged that instead of developing the four projects as promised, NDD and its principals misappropriated more than $25 million of investor funds to pay undisclosed commissions to agents and compensation to Gavin and Hogan, and make investments in unrelated projects for Gavin and Hogan's personal benefit.

101.     The SEC also alleged that the NDD investments were securities in the form of "investment contracts," were not registered with the SEC, and were not exempt from registration.

102.     The SEC also alleged that NDD engaged into an offering of unregistered securities, in violation of the securities laws and regulations.

103.     On May 5, 2015, the North Dakota Securities Department served a Cease and Desist Order on NDD alleging, among other things, that the NDD Offering constituted an unregistered, non-exempt sale of investment contracts (i.e., securities) within the meaning of N.D.C.C. § 10-04-02(19) and that NDD and its principals made misrepresentations and omissions of material fact in connection with the sale of securities in violation of N.D.C.C. § 10-04-15(2).

104.     At the SEC's request, attorney Gary Hansen was appointed Receiver for NDD by the Court.  According to the Receiver's initial report dated June 26, 2015, although NDD is

believed to have raised more than $62 million in connection with the NDD Offering, he had only located approximately $175,000.00 in cash and liquid assets owned by NDD.

105.    Thus, Plaintiffs have lost the vast majority of their investments as a result of Defendant's sales of NDD securities to them.

106.    Plaintiffs now bring this action against Defendant for statutory damages arising from Defendant's actions as NDD's agent and his conduct in actively assisting NDD in connection with the NDD Offering. *See* N.D.C.C. § 10-04-17 (providing that every "agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser.").

**FIRST CAUSE OF ACTION**
**(For Liability Under the Securities Act of 1933, 15 U.S.C. § 77)**

107.    Plaintiffs incorporate the above paragraphs by reference.

108.    Defendant violated Section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77l(a)(2)) by, in connection with the offer or sale of securities, making untrue statements of a material fact and omitting to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

109.    Each of Defendant's above-described misrepresentations and omissions was material.

110.    Plaintiffs relied or may be deemed to have relied to their detriment on Defendant's above-described material misrepresentations and omissions.

111.    Plaintiffs did not discover and could not have reasonably discovered Defendant's misrepresentations and omissions until May 6, 2015.

112.    Plaintiffs were damaged as a direct and proximate result of Defendant's violations in an amount to be proven at trial.

20

## SECOND CAUSE OF ACTION
### (For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Offering and Selling Unregistered Securities – Strict Liability)

113.    Plaintiffs incorporate the above paragraphs by reference.

114.    Defendant and NDD violated N.D.C.C. § 10-04-04 by offering and selling securities in the NDD offering that were neither registered nor exempt from registration as described hereinabove.

115.    Under N.D.C.C. § 10-04-02.13, an "offer to sell" securities is defined as "every attempt or offer to dispose of, or solicitation of an order or offer to buy, a security or interest in a security for value."

116.    Under N.D.C.C. § 10-04-02.14, "sale" or "sell" means "every sale, contract to sell, or disposition of a security or interest in a security for value, and every contract to make any such sale or disposition.

117.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

118.    Under N.D.C.C. § 10-04-17, every sale of unregistered securities is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

119.    Defendant – as "offeror"/"seller" of NDD securities as well as "agents" of NDD - is jointly and severally liable to Plaintiffs for his sales of NDD unregistered securities, in violation of the North Dakota Securities Act.

120.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to

Defendant and demand that Defendant refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

**THIRD CAUSE OF ACTION**

**(For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Sales of Securities by Unlicensed Agents - Strict Liability)**

121.    Plaintiffs incorporate the above paragraphs by reference.

122.    Defendant violated N.D.C.C. § 10-04-10 by selling NDD securities to Plaintiffs as an unregistered agent.

123.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

124.    Under N.D.C.C. § 10-04-17, every sale of securities by unregistered agents is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

125.    Defendant – as "seller" of NDD securities and "agent" of NDD – is jointly and severally liable to Plaintiffs for his sales of NDD securities as unregistered agents, in violation of the North Dakota Securities Act.

126.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to Defendant and demand that Defendant refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment:

1.      Awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

2.      Awarding statutory attorneys' fees and costs, and other relief;

3.      Granting such other relief as to this Court may seem just and proper.

Dated:  May 5, 2017

SCHNEIDER, SCHNEIDER & SCHNEIDER

*/s/ Mac Schneider*

Mac J. Schneider
317 ½ Kittson Ave.
Grand Forks, ND 58201
Telephone:  (701) 757-2050
Facsimile:  (701) 757-2051
E-Mail: mac@schneiderlawfirm.com

PEIFFER, ROSCA, WOLF,
ABDULLAH, CARR & KANE
A PROFESSIONAL LAW CORPORATION
Alan L. Rosca (*pro hac vice*)
James P. Booker (*pro hac vice*)
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
Telephone:  (216) 570-0097
Facsimile:  (888) 411-0038
E-Mail:  arosca@prwlegal.com

SHINDLER ANDERSON GOPLERUD &
WEESE P.C.
J. Barton Goplerud
Brian O. Marty
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone:  (515) 223-4567
Facsimile:  (515) 2223-8887
E-Mail:  goplerud@sagwlaw.com
        marty@sagwlaw.com

*Counsel for Plaintiffs*

24